IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


```
MELISSA A. HUNTER,          )
                            )
     Plaintiff,             )
                            )        CIVIL ACTION NO.
     v.                     )          2:04cv749-T
                            )             (WO)
BARBOUR COUNTY, ALABAMA,    )
et al.,                     )
                            )
     Defendants.            )
```

## ORDER ON PRETRIAL HEARING

A pretrial hearing was held on this case on July 19, 2005, wherein the following proceedings were held and actions taken:

1.  PARTIES AND TRIAL COUNSEL: The parties before the court are correctly named as set out below; and the designated trial counsel for the parties are as set out below:

| PARTIES | TRIAL COUNSEL |
|---|---|
| Plaintiff: Melissa A. Hunter | Ann C. Robertson and Temple D. Trueblood (Wiggins, Childs, Quinn & Pantazis, L.L.C.); and Bobbie S. Crook |
| Defendants: | C. Winston Sheehan, Jr., and Allison Alford Ingram (Ball, Ball, Matthews & Novak, P.A.) |

COUNSEL APPEARING AT PRETRIAL HEARING:

For plaintiff:          Ann C. Robertson

Temple D. Trueblood

WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.

Bobbie S. Crook

For defendants:      C. Winston Sheehan, Jr., and

Allison Alford Ingram

BALL, BALL, MATTHEWS & NOVAK, P.A.

1.    <u>JURISDICTION AND VENUE</u>:   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4), and 42 U.S.C. § 2000e-5.  The plaintiff was employed within Barbour County, Alabama, and the Defendants are all located within Barbour County.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(g).  Personal jurisdiction is not contested.

2.    <u>PLEADINGS</u>: The following pleadings and amendments were allowed: Complaint, and Amended Complaint by the plaintiff; Motion to Dismiss Complaint by Barbour County, Alabama and Barbour County Commission and the plaintiff's response thereto; Motion to Dismiss Complaint by Barbour County Sheriff's Dept.; Answer of Defendants Marshall J. Williams, Jr., George Parham and Jean Hartzog; Motion to Dismiss Amended Complaint by Barbour County Sheriff's Dept. and the plaintiff's response thereto; Motion to Dismiss Amended Complaint by Barbour County, Alabama and Barbour County Commission and the plaintiff's response thereto; and Answer to Amended Complaint.[1]

4.    <u>CONTENTIONS OF THE PARTIES</u>:

(a) The plaintiff:

---

[1] Although the parties recognize that "motions to dismiss" are not pleadings pursuant to the Federal Rules of Civil Procedure, the motions were included because to date no ruling has been made as to the Motions to Dismiss asserted in this action.

This is an action for legal and equitable relief to redress sexual harassment, discrimination based on sex and unlawful retaliation against the plaintiff. The suit is brought to secure the protection of and to redress the deprivation of rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981a (hereinafter "Title VII"); and the Fourteenth Amendment to the Constitution of the United States. The plaintiff asserts her claims for relief for the defendants' violations of the Fourteenth Amendment through 42 U.S.C. § 1983 (hereinafter "§ 1983").

The plaintiff, Melissa Hunter ("Hunter"), is an African-American female who first became employed by the defendants in the Barbour County Sheriff's Department from 1998 through 2001, when she resigned her position due to personal reasons. In 2002 Hunter became re-employed by the defendants in the Barbour County Sheriff's Department as a dispatch jailer. During this time, Evelyn Person was a jail supervisor for the second shift and supervised Hunter and George Parham was the Assistant Jail administrator to Jean Hartzog, the Jail Administrator, who reported directly to Sheriff Williams. Marshall J. Williams, Jr., was appointed as Sheriff of Barbour County in November 1998. There are three shifts at the jail: first shift from 6:00 a.m. to 2:00 p.m., second shift from 2:00 a.m. to 10:00 p.m., and third shift from 10:00 p.m. to 6:00 a.m. In 2003 Arlene Griglen was the first shift supervisor; Person was the second shift supervisor; and third shift was jointly supervised by Parham, Person and Griglen.

During her employment, Hunter was subjected to repeated acts of unwelcome sexual harassment by Parham. Parham started making sexual gestures and comments to Hunter when she first began her employment in 1998. She told him to stop and he did until she returned to her employment in November 2002. On November 7, 2002, Parham approached Hunter in the dispatch room and told her he wanted to make love to her and told her he was attracted to her. Parham told her he "wanted some pussy," and that ever since she'd been around he had been after some of the "Connecticut pussy," and asked why she hadn't given him the time of day. Parham kept asking her for sex until he left work that afternoon. This same day, an inmate in the Jail named Orlando told Hunter that Parham had told him there was something about Hunter and that Parham had to have her and wanted her "pussy" and had to have it. Another time, Hunter came into work with her boyfriend and later Parham asked her if she was trying to make him jealous and show him what kind of competition he had for her. He again told Hunter he "wanted some of that pussy" and asked why she wouldn't give it to him. He also told her if she wanted money

3

just to tell him how much.  Orlando later told Hunter that Parham said he had to have her and wanted to "taste them luscious lips and suck them big titties." Another day Parham called Hunter to his office and repeatedly told her he wanted to "fuck" her and that she wanted him just like he wanted her and told her to just admit it to herself.  He then told her if she wanted "big daddy" to take care of her to get his phone number and pager number and just call "big daddy."   The next day Parham asked Hunter again about having sex and told her she didn't need to wear her lip gloss because "you make my dick get hard when I think of what them sexy lips can do." Then he asked if she liked oral sex.  The following day Parham continued to sexually harass Hunter, telling her he had to have some of " that pussy" and asking her questions about having sex.

Parham also offered Hunter money to have sex with him. Parham had received a bonus check and told Hunter, "I'll give you this whole paycheck if you will just fuck me."  Hunter replied she did not want his money and Parham persisted, stating if she knew how much it was she would change her mind and he would sign over the check to her right there.  The same day, Parham walked over to Hunter, stared at her chest and told her "I just want to put some chocolate syrup or honey on those big titties and lick it all off."  Later, Orlando told Hunter that Parham had said she was a hard woman but if it was the last thing he did Parham was going to fuck her.  The day before Thanksgiving Parham asked Hunter if she would be his Butterball so he could sit her on the table and eat her pussy and suck it dry. Parham then offered her money again and said he didn't mind paying a few bills for her. Then Parham told Hunter he had called her boyfriend's place of employment and asked what days he had off so they could "make this happen" and her man would never know.  He asked to come to her house and when she told him no he then asked if she needed a ride home to which she also replied, "no."

Orlando told Hunter that Parham had confided in him about her and Parham had said he wanted to put his penis between her breasts and "titty fuck" her; that he was going to get her to ride with him to pick up an inmate and then get a motel room and have sex with her; that he wants to put honey and whip cream on her body and eat it off; that she has pretty skin; that he wants to fuck her and kiss her big lips. Hunter testified that Orlando told her things that Parham had told him about Hunter, including that Parham said "he wanted to put whip cream and honey on my big titties and suck it off." Parham also told Orlando that he couldn't stand for her to wear lip gloss "because it makes his dick get hard, and he just could imagine how I could do oral sex."  Parham also told Hunter she had to have sex with him in order to be

4

moved to first shift. Hunter had asked Parham to move her to first shift and he told her the only way she could move was if she did him right and gave him some pussy.

Hunter testified she had never "come on to" Parham or used lewd or sexual talk with him and that she repeatedly told Parham she did not like his comments and asked him to stop talking to her in a sexual way. Hunter repeatedly told Parham she was not interested in him, denied his advances and told him to stop talking to her about sex.

Hunter complained to Evelyn Person, Gene Hamric, Jean Hartzog and Sheriff Williams about the sexual harassment to which she was being subjected by Parham. Hunter first complained of the sexual harassment to Person in the first week of November 2002, telling Person that Parham "kept asking me for my pussy," that it is an ongoing thing, she was not comfortable with it and that she wanted it to stop. Person responded Person by instructing the plaintiff to let Person go through the chain of command in reporting it to Hartzog and then the Sheriff. Hunter waited 2-3 days for Person to get back with her about the complaint. At the direction of Person, Hunter filed a written sexual harassment complaint with Lieutenant Gene Hamric. Lt. Hamric typed up an Alabama Uniform Incident/Offense Report dated December 6, 2002, which Hunter signed and to which was attached Hunter's own eleven (11) page written statement dated December 5, 2002, detailing the sexual harassment which she had prepared per Person's instruction that the complaint should be made in writing.

Thereafter, Hartzog and Sheriff Williams called Hunter in to speak to her about her sexual harassment complaint on December 10, 2002. Williams did not ask Hunter about what was going on or how long it had been happening. During this meeting, Sheriff Williams asked Hartzog for the book with the sexual harassment policy and Hartzog gave him the Barbour County Personnel book. Sheriff Williams said they had to find about sexual harassment and the jail's policy because "they didn't know if they went under the County Commission's rules and regulations or the Sheriff's Department's rules and regulations." Sheriff Williams then read a policy that stated Parham could be suspended or terminated and Williams told her that Parham would be suspended for three (3) days. At the end of the meeting, Sheriff Williams told Hunter that if it happened again to let someone know and to tell him, Jean Hartzog or Evelyn Person.

5

On December 11, 2002, Sheriff Williams then turned the sexual harassment complaint over to the District Attorney's office and "expected them to handle it." Williams did not investigate the complaint and did not oversee or participate in the investigation of Hunter's complaint.  Williams never spoke to Hunter to see if she was satisfied with the results of the investigation or to follow up and see if any more sexual harassment occurred.

Hartzog then instructed Hunter to Ronnie Dollar, the District Attorney. Hunter spoke with Dollar at the Eufala courthouse and told him everything about the sexual harassment by Parham and that she had made a complaint.  Dollar already had Hunter's written statement and the report of Lt. Hamric and told her that the Sheriff had turned the matter over to him to investigate. Dollar informed Hunter he would talk to Parham then get back with the Sheriff and for her to wait until then.  The record of Dollar's investigation is contained in a two page "Case Summary" which sets out that Dollar interviewed Hunter on December 11, 2002, and then Parham on December 13, 2002.  The report states that Parham "admitted that he could have said, (sic) some things that he should not have said," and that Parham would apologize to Hunter in a meeting.

Hunter met with Hartzog, Dollar and Parham after the investigation.  In this meeting Dollar stated that Parham had admitted to sexually harassing her and they wanted everyone to handle it like adults and no one to be imprisoned. Hartzog instructed Hunter to "leave this here; don't take it no further." Person, the plaintiff's shift supervisor, was not told to watch out for any more acts of sexual harassment. Parham was not suspended, demoted, terminated or subject to any loss of income and Williams is not sure that anything was even placed in Parham's file regarding the complaint and investigation.

After the meeting with Dollar and Hartzog, Parham stopped the sexual harassment of Hunter "for a few months and then he started back again," when she started working on the first shift around February 2003.  Hunter came into work after having her hair done and Parham commented on her hair and then told her, "What did you do, get your hair done so I could play with it?"  Hunter told him not to "start this again" and walked away.  Another incident occurred a few weeks later, on March 2, 2003, in the hallway when Parham told Hunter, "You know what, I'm going to get me some of that pussy yet."  Hunter replied by telling Parham not to "start this again" and that she "don't want to go through this again."  Parham replied that it would be her word against his and "if it's the last thing I'm going to do, I'm

going to get some of that pussy." Hunter immediately told Deborah Roberts about Parham's comments to her. When Person came on shift at 3:30, Hunter complained to her again about Parham. Person told her to stay away from Parham. The next incident occurred when Parham tried to cuff Hunter's butt. Hunter complained again to Person that Parham had tried to cuff her butt and she only told Hunter he had better be glad he didn't touch her. Nothing was done about Parham continuing to sexually harass Hunter.

The sexual harassment continued in late April or early May 2003, when Parham approached Hunter and another female employee, Diane McNeal and made sexually inappropriate statements about his sexual activities the night before and the size of his penis. Shortly after this, Callie Heath, a co-worker of Hunter, told her that she could not believe that Parham "thought he could get some pussy from [Hunter] without Angie knowing, without it ever surfacing to anyone." Heath also told Hunter that she had been told by Hartzog not to talk to Hunter and that they had to find a way to fire Hunter because she had filed a lawsuit against them. Two deputies, Ernestine and Jerome, also told Hunter that Hartzog and the Sheriff wanted Hunter to no longer be employed because they did not want to be sued.

Shortly after this in April/May 2003, Heath told Hunter that Parham would ask Heath how she thought Hunter would feel if he asked her to ride to Florida with him. Orlando told Hunter that Parham was telling him he was going to take Hunter on a ride to Dothan and that would be his chance to try and "move in on" Hunter. When Hunter learned this, she complained about it to Person. Person just told Hunter not to go with Parham and nothing was done about Parham continuing to sexually harass the plaintiff.

On August 16, 2003, there were four people working at the Jail: Hunter (main dispatcher), Debra (E911 operator), Billy Curry (Jailer) and Sunset Parker (Jailer). Person was the supervisor for that shift, but was off that day. That evening Sunset repeatedly called Hunter to come to the back at the request of a work release inmate and she eventually agreed and went in the back. Hunter walked down the hall and saw the middle door was closed, but then noticed that the door to cell block 300 was open with two inmates standing in the door which was propped open with a cooler [fan]. Hunter left the door open for the work-release section to talk to Mark Curry, the inmate that had requested her, and she saw another inmate, Malaysia Pugh, walk out of the work release block. Pugh was a trustee and should not have been walking the halls in work release block so Hunter told him to go back to where he belonged

7

and he did.  Hunter finished talking to the inmate and then closed the work release and trustee doors. Hunter then went to the jailers' cube and asked Sunset why the 400 block door was open and he replied it has been open all day.  Hunter then told Sunset and Billy that they knew better and to go close the door.  They said they were wrong and Billy replied that he would go close the door.  Hunter left the cube with Billy and he said he was going to go lock the door as Hunter walked back to the front through the middle door.

Hunter returned to the front and told Debra about the open and unlocked doors.  Debra then called Sheriff Williams and told him about the incident.  The Sheriff told Debra he was sending a Deputy to the Jail to take pictures and instructed her not to tell Billy or Sunny because the Sheriff wanted to "catch them."  Hunter then called Person and told her what was going on at the Jail who instructed Hunter not to tell Billy or Sunset that the Deputy was coming and to let the Deputy take pictures and write up the incident.  Person also told Hunter she had done the right thing by calling her and the Sheriff.  The Sheriff is not sure that a senior dispatcher is in charge of the Jail if a supervisor is not present and he does not recall any training or written policies that provide for this.

Deputy Kenneth Raybon arrived at the Jail and Hunter and Debra remained in the dispatch area and let him through the doors to the back.  Deputy Raybon returned to the dispatch area and said he had told Billy and Sunset that he wanted the doors locked at all times and he would report the incident to the Sheriff.  Raybon then issued a Report on the incident. Hartzog returned from her vacation and Hunter told her about the incident with Sunset and Billy and Hartzog brought the two jailers into the office and spoke to them.  Three days later Hartzog met with Parham and then came to Hunter and Debra and handed them written discipline notices.  Debra was given a notice dated August 17, 2003, placing her on a three day suspension without pay.  Hunter was given a notice dated August 18, 2003, placing her on a three day suspension without pay.  Person was there at the time and Hunter asked her why she was being suspended to which Person replied she did not know and that she [Person] had had nothing to do with it and it was Hartzog, Parham and Arlene's decision.  Billy and Sunset received written warnings dated August 18, 2003, stating, "[y]ou are being recommend for not doing your job on August 16, 2003."  Both warnings stated that "The next time will mean dismissal for you." They were not suspended and lost no pay.

The Sheriff's Department has a progressive discipline policy which provides for a series of discipline starting with a verbal counseling, then a warning, then a write up and ending with termination. No exceptions are made under this policy and there is no exception under this policy for "senior officers." Prior to her suspension, Hunter had received no verbal or written warnings.

Hunter was suspended for three (3) days and then returned to work her full shift where she continued to work until she became ill in early 2004. In February 2003 Hunter was moved to first shift and remained there for about two and a half months. (Hunter, p. 168:5-14; 170:20-22). Hartzog then asked Hunter for a favor and to move back to second shift to cover for Person while Person was out for E911 school for two to three weeks. Hunter was told that once Person finished E911 school that she would be returned to first shift. Person returned from E911 school and Hunter remained on second shift. Hunter asked Hartzog why she had not returned to first shift and was told they did not need anyone on the first shift because Hartzog had hired Jeff on that shift.

On October 9, 2003, two jailers Billy Curry and Peanut got locked into the cells. Hunter was on duty and saw Ray McCloud at the locked middle door waving his hands and then banging on the door and calling for Hunter. Hunter and Debra called to the back and got no response. Hunter then went in the back and Ray told her that Peanut was locked in a cell and Billy was locked in cell block 100. Hunter went to the jailer's cube, which was unlocked, and then found Billy in cell block 100 playing cards with the inmates and found Peanut in cell 301. Hunter unlocked the cells and let the jailers out of the cells. Hunter returned to the front dispatch area, called Person and told her what had happened. At Person's direction, Hunter then wrote up the incident and gave the original report to Hartzog and placed a copy in Person's mailbox. Ten days later, Billy was issued a written warning on October 20, 2003, by Hartzog and Parham along with a three day suspension for this incident which states, "This is the second time. The next time you will be dismissed." Although Hunter was the senior office on duty at the time, there was no reason to discipline her for this incident.

On April 27, 204, Billy Curry also received a verbal warning because he was bringing contraband into the jail for inmates, including food, cigarettes and a camera. By this time, Curry had already received a prior verbal warning in August 2003 and a three day suspension and warning in October 2003 and under the Jails' progressive

discipline policy was due to be terminated.  Curry was not terminated or suspended over this rule violation.

Hunter attended jailer school in April 2000 where she did not receive any instruction on sexual harassment. Hunter did not attend a seminar or course put on by St. Paul Insurance Company for sexual harassment and had no knowledge of such a seminar prior to her deposition taken on February 23, 2005.  When Hunter became re-employed in the Barbour County Sheriff's Department in 2002, she received a copy of the Barbour County Jail Policy and Procedure Manual.  The Jail Manual's index does not match the contents of the manual and lists only up to seventeen (17) pages, while the Manual itself consists of two hundred and ten (210) pages.  The index to the Jail Manual does not list a sexual harassment policy. A sexual harassment policy had not been posted anywhere in the jail in 2002 or 2003 and there was no procedure in place to hand out the sexual harassment policy and go over it each year with employees in the jail.  They did not provide information or training to the employees about what constituted sexual harassment, retaliation or about how to report sexual harassment.

The sexual harassment policy of the Barbour County Sheriff's Department does not contain a provision about protection from retaliation nor does it contain a reporting system or how an employee should make a report to of sexual harassment. The policy provides that anyone who commits sexual harassment will be suspended or terminated.  The Sheriff did not know what the sexual harassment policy required for handling a report of sexual harassment. The policy states the Jail Administrator will investigate complaints of sexual harassment, not the county District Attorney. The Sheriff did not bring Hunter's sexual harassment complaint to Hartzog for investigation and Hartzog had never been trained on how to conduct such an investigation at the time Hunter made her complaint.  Hartzog did not have sexual harassment training until after the time that Hunter made her complaint.  Person had never received any training on sexual harassment or the sexual harassment policy of the Sheriff's Department and had never been told she was supposed to take reports of sexual harassment and she did not know she was supposed to do so.

The sexual harassment policy found in the Barbour County Personnel Policies does not apply to employees in the Sheriff's Department and if an employee from the Sheriff's Department made a sexual harassment complaint to the Commission no action would have been taken.

10

Upon Hunter's initial employment in 1998, she completed a "Personnel Record, Barbour County Commission." At this time, she also was issued a Personal Inventory list setting out the items "issued to you by Barbour County" to include shirts, shoes and pants. When Hunter was re-hired in June 2002, Hartzog sent correspondence to the Barbour County Commission informing them of this and "request[ing] that the Barbour county Commission concur in this hiring." Barbour County Commission also maintains a separate personnel file or record for each employee in the Sheriff's Department. The Barbour County Personnel Policy, as adopted September 1, 1995, is provided to Barbour County employees when they are signed up to work for the County. The Barbour County employees are given an acknowledgment form to sign upon receipt of the Barbour County Personnel Policy. Employees in the Sheriff's Department signed acknowledgment forms for receipt of the Barbour County Personnel Policy. Hunter signed an acknowledgment form for receipt of the Barbour County Personnel Policy on October 27, 1999. Barbour County Commission and the Sheriff's Department do not have separate forms for use with their policies.

Drug testing for employees of the Sheriff's Department is conducted by Absolute Drug Detection, the same company that conducts drug testing for Barbour County employees. The drug testing is conducted the same way for employees of the Sheriff Department as it is for County employees. The County pays for the drug testing from each department's budget. Barbour County Commission is the entity that has authority to release results of employee drug screens for both employees of the Commission and of the Sheriff's Department.

Worker compensation claims for employees in the Sheriff's Department are turned into the County Commission where the County Administrator signs off on them and sends them to the worker compensation carrier. The County has only one worker compensation policy that covers all employees, including the employees in the Sheriff's Department. The County handles retirement matters for employees in the Sheriff's Department because there is only one retirement system for both County and Sheriff employees and the Sheriff's Department does not have a separate retirement system. Unemployment claims for employees in the Sheriff's Department are regularly sent to and handled by the County Commission office which did handle the unemployment claim of Hunter. The medical insurance coverage for employees in the Sheriff's Department is also maintained by the County. The County Commission keeps up with the days used and accrued by employees in the Sheriff's Department for medical leave, sick leave and annual leave. Requests for leave made

11

by Hunter were processed via the Barbour County Commission Leave Request and Approval forms.

The County Commission handles the I-9 eligibility forms for employees in the Sheriff's Department and a prospective employee must complete the form and provide forms of identification  for copying and verification at the County Commission payroll office.  Hunter completed her I-9 eligibility form which was certified by Tina Wade, the County Payroll Clerk, and lists Hunter's "Employer" as the Barbour County Commission.The County is the entity that responds to any inquires or audits from the Department of Labor regarding the eligibility of employees in the Sheriff's Department.

If a third party desires to verify the employment of an employee in the Sheriff's Department, the inquiry is handled by the County Commission. The Park Meadows apartment complex requested employment verification of Hunter and the County Payroll Clerk completed the verification form, listed the Barbour County Commission as Hunter's present employer and returned the form with this representation to the apartment complex.

The County Commission carries liability insurance coverage through St. Paul Insurance Company with the St. Paul Insurance Policy exclusively for Public Entities.  This policy also covers incidents which may occur in the Sheriff's Department.  The County Commission pays the insurance premium and the payment is not taken from the Sheriff's budget.  If a member of the Sheriff's Department is sued and found liable or the matter settles, the funds to pay for that matter come from this St. Paul's insurance policy coverage. Also, under this policy, St. Paul's pays for legal representation for a member of the Sheriff's Department.   In the present lawsuit, all of the named defendants are represented by a single set of counsel for which St. Paul's is providing coverage.

Sheriff Williams and all of the employees in the Sheriff's Department, including Hunter, are paid by Barbour County.  On December 23, 2003, the Barbour County Commission Chairman, W.F. Struagh, Jr., sent a letter addressed to "Dear Employees" to employees of the Sheriff's Department informing them that the Barbour County Commission had voted to approve a one time salary supplement for them to "thank you for your dedication, hard work, and dedication to Barbour County during the past year.  This holiday bonus was given by the Commission to include Sheriff employees.  In 2005 the employees of the Sheriff's Department

received a 5% raise as passed by the Commission.  The only way a raise may be obtained for employees in the sheriff department is through the County.

The County also provides all funding to operate the Sheriff's Department. Williams makes a request to the County who then provides him with an annual budget for the Department.  Williams provides the County Administrator with a proposed budget and then the County Commission decides how much money the department gets. The County Commissioners set out the budget process. The Barbour county Fiscal management policy provides the procedure for budget revisions: "Any budget revision shall be recommended by the Jail Administrator to the Sheriff and then to the Barbour County Commission."  The Barbour County Jail Purchasing Policy states, "All purchases for the jail will be made in accordance with the purchasing procedures established by the Barbour County Commission." The County Administrator handles all accounting and payroll for both the County and the Sheriff's Department and all accounting records for the Sheriff are maintained by the County.  The Sheriff's Department does not have its own separate banking accounts and the County has to pay all of the bills and expenses of the Sheriff's Department from the general fund.  If a Department needed extra funding, the County would have to borrow the funds and the department could not do so.

The members of the Barbour County Commission are also members of the Personnel Committee.   The Personnel Committee meets about one week prior to a Commission meeting and draft a Personnel Committee Report & Recommendations.
In the August 4, 1999, Personnel Committee Report & Recommendations there are three separate recommendations regarding personnel matters in the Sheriff's Department. The Personnel Committee voted on three matters proposed by the Sheriff regarding his employees: to increase salaries of five employees in the Sheriff's Department, including Hunter; to change Parham's position; and to create two job slots of Sargent and terminate two job slots of deputy.  Someone from the County has to authorize these changes before the County pay roll clerk can make them.  These matters were made by motion to the committee, and then required to be seconded and voted upon before being implemented.

Hunter filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 22, 2003, against the Barbour County Sheriff Department.  In this Charge, Hunter stated that she had filed sexual harassment charges against George Parham and was thereafter discriminated against and retaliated against by being suspended for three days without pay.  Via

correspondence dated September 30, 2003, the EEOC notified Hunter that her Charge had been incorrectly signed in the wrong signature box and enclosed another Form 5 for Hunter to sign correctly.   Hunter returned the Form 5 with her signature in the correct location on the form.   On January 28, 2004, the EEOC log indicates that the EEOC Investigator Support Assistant assigned to Hunter's charge had "finally retyped the charge and mailed it to CP [charging party] for signature."   On February 5, 2004, the EEOC received the Amended Charge from Hunter properly assigned again.   The plaintiff's Amended Charge and Notice of Charge was sent to the Chief Executive Officer of the Sheriff's Department on March 5, 2004.

During the EEOC investigation, both Hunter and her counsel at that time informed the EEOC that she was continuing to be subjected to sexual harassment by Parham: "CP's attorney stated in his rebuttal that CP stated that she is still being bothered (sic) by the alleged harasser."   Also, the EEOC file contains handwritten notes provided by Hunter which clearly set out that she was still being subjected to sexual harassment by Parham and that Hunter had continued to complain to her supervisor about the sexual harassment.   These notes also made it clear that Hunter was complaining of further acts of retaliation for her sexual harassment complaint by being moved onto second shift and that she had been told they were trying to fire her or make her quit.

Defendants Barbour County, Alabama, the Barbour County Commission, and the  Sheriff of Barbour County were the employer and/or joint employer of plaintiff and/or they served as agents of one another with respect to the employment of plaintiff.

Defendants Williams, Parham, Hartzog and are state actors for purposes of 42 U.S.C. § 1983.   Defendants Williams, Parham and Hartzog, in their individual capacities, are not afforded immunity protection because a reasonable official in each of their respective positions would have known that his/her actions would violate a constitutional right that was "clearly established" at the time of the violations described herein.

The defendants violated the plaintiff's federally protected rights by subjecting her to sexual harassment, sexual discrimination and retaliation, as set out above. Plaintiff was willfully and maliciously sexually harassed by George Parham, thereby being discriminated  against on the basis of sex with respect to the terms, conditions, and privileges of her employment.   In retaliation for her complaints about sexual

harassment and sex discrimination, plaintiff was transferred to a less desirable position and suspended without pay. Plaintiff suffered damages as a proximate result of these violations, which were caused by governmental policy or custom and/or a failure to adequately train in compliance with Title VII and federal laws caused by deliberate indifference to the plaintiff's rights and/or by deliberate indifference to those violations.

The defendants had actual knowledge of, or should have had knowledge of, the sexual harassment and discrimination of plaintiff and failed to take prompt and effective corrective action in response thereto. The defendants did not have a well-known, well-disseminated, effective and/or enforced sexual harassment and/or discrimination policy in place at the time of plaintiff's employment.

The unlawful actions of the defendants, as described above, were willful, wanton, malicious and/or committed with reckless disregard of and/or deliberate indifference to the plaintiff's federally protected rights.

Because of the unlawful actions of the defendants, the plaintiff has suffered economic damages such as loss of pay, emotional distress, mental anguish, embarrassment, humiliation, inconvenience, and loss of enjoyment of life.

Plaintiff seeks declaratory and injunctive relief. The plaintiff respectfully requests that the Court grant the plaintiff a declaratory judgment holding that the actions of the defendants described herein above violated the rights of the plaintiffs as secured by Title VII and the Fourteenth Amendment 42 U.S.C. § 1981.

Plaintiffs respectfully request that the Court grant the plaintiff a permanent injunction enjoining the defendant, agents, successors, employees, attorneys and those acting in concert with the defendant and on the defendant's behalf from continuing to violate Title VII and the Fourteenth Amendment to the Constitution of the United States, as asserted via 42 U.S.C. § 1983.

Plaintiff respectfully requests that the Court grant her an order requiring the defendants to make her whole by awarding her instatement where appropriate (or front pay), back pay (with interest), punitive damages, compensatory damages for emotional distress, and/or nominal damages.

Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses.

All administrative prerequisites have been met and all claims were timely filed.

All defenses not pled previously have been waived.

The plaintiff demands a jury trial on all issues friable before a jury.

    (b)   The Defendants:

Plaintiff Melissa Hunter was employed as an E-911 Operator/Jailer/Dispatcher in the Office of the Sheriff of Barbour County. She worked for Sheriff Williams on two separate occasions – from 1998 to June 2001, when she resigned for personal reasons relating to a divorce she was going through. She was rehired in July 2002 and worked until she resigned for a better job closer to home with higher pay and better benefits.

Ms. Hunter was not an employee of Barbour County, Alabama, or the Barbour County Commission. The fact that Barbour County, by and through the Barbour County Commission, paid the wages and benefits of Melissa Hunter, as well as handled all matters related to compensation, insurance, or other financial matters, does not alter the employment relationship between the Office of the Sheriff of Barbour County, and Barbour County, or the Barbour County Commission. Under Alabama law, these entities were required to handle these funding matters. Neither Barbour County nor the Barbour County Commission had any authority to determine who was employed by Sheriff Williams, what positions they were assigned to by him, any discipline to be given to these employees, and whether they should be terminated.

Ms. Hunter alleges that she was subjected to sexual harassment by Assistant Jail Administrator, George Parham. She contends that the harassment began during a prior period of employment with Sheriff Williams in 1998. She contends that she told Mr. Parham to stop, which he did. It is undisputed that Ms. Hunter did not report this to anyone.

Ms. Hunter contends that, during her reemployment in 2002, the sexual harassment began on November 6, 2002. She did not report the alleged harassment and/or file charges against Mr. Parham until December 6, 2002. This was the first time, since Sheriff Williams had taken office approximately four years' earlier, that anyone in the Sheriff's Office had ever made a complaint of sexual harassment. As a result, the Sheriff did not have any prior experience handling a sexual harassment

complaint.  Because the alleged harasser was the Assistant Jail Administrator, Sheriff Williams determined it would be better to have an impartial investigator from outside of his office to do the investigation.  As a result, he contacted the Barbour County District Attorney's Office.  An investigation was conducted into the allegations by Investigator Ronnie Dollar with the Barbour County District Attorney's Office.  The results of the investigation did not conclusively reveal that Mr. Parham had sexually harassed Ms. Hunter or engaged in any illegal conduct.  Mr. Parham admitted that he could have said things to Ms. Hunter that he should not have said, but that the comments did not appear to be unwelcome by Ms. Hunter, and that it was his opinion that they were engaging in consensual conversation.  Because Ms. Hunter made a complaint about his conduct, however, Mr. Parham apologized to Ms. Hunter and advised her that he would not engage in any further such conversation.  Ms. Hunter had previously advised Sheriff Williams that she wasn't trying to get anyone in trouble, that she just wanted Mr. Parham to stop, and that she did not want him to lose his job.   Mr. Parham was not disciplined because there was no conclusive finding of sexual harassment.  He was, however, advised by Investigator Ronnie Dollar with the Barbour County District Attorney's Office and Jail Administrator, Jean Hartzog, that any inappropriate or sexually harassing conduct would result in his termination.

Ms. Hunter contends that she was subjected to additional sexual harassment by Mr. Parham.  She contends that she complained to her Shift Supervisor, Evelyn Person, in March, 2003.  Ms. Person denies that she received any such complaint. It is undisputed that Ms. Hunter did not complain to Sheriff Williams or to Jean Hartzog.  Ms. Hunter admits that Sheriff Williams has always treated her with courtesy and respect, and never been rude to her.

Following her alleged March, 2003 complaint, Ms. Hunter contends that she was subjected to discriminatory and retaliatory treatment when she was transferred from her position on the First Shift to the Second Shift.  It is undisputed, however, that Ms. Hunter worked on the Second Shift at the Barbour County Jail from July 2002 through December 2003.  She was first assigned and worked on the First Shift at the Barbour County Jail in 2004.  She worked on the First Shift in January and February 2004, when she moved to the Second Shift to temporarily help fill in for Evelyn Person. Evelyn Person had a planned vacation and Jail Management Training scheduled in March and April of 2004.  Ms. Hunter was not forced to move to the Second Shift. Instead, she was asked if she would assist in covering Ms. Person's shift while she was out, and Ms. Hunter voluntarily agreed to the shift change.

Ms. Hunter contends that she was never permitted to return to the First Shift, and that, instead, a man named Jeffrey Smith was hired to replace her. Ms. Hunter worked as an E-911 operator/dispatcher, which required specialized training regarding the dispatching and handling of emergency calls. Her position had a higher rate of pay than that received by individuals who worked as jailers. In addition, the E-911 operators/dispatchers worked in a different area of the jail than jailers did. Jeffrey Smith was not hired as an E-911 operator/dispatcher. Instead, he was simply hired as a jailer, at a lesser rate of pay. Ms. Hunter did not have a jailer position, and Mr. Smith was not, therefore, hired to replace Ms. Hunter. Ms. Hunter never returned to the First Shift because she went on medical leave on May 8, 2004, and never returned to work.

In August, 2003, Ms. Hunter was suspended for three days without pay for violation of policy regarding leaving jail cell doors open when they should have been closed. She contends this was sexually discriminatory because two male jailers who were also involved in the same incident were not given as harsh a punishment as she was. She also contends it was in retaliation for her prior complaint of sexual harassment. Ms. Hunter was given a three-day suspension without pay while two male jailers were only given warnings.

Following the incident, Sheriff Williams advised Jail Administrator Jean Hartzog that he wished for her and the other supervisors to determine what the appropriate punishment, if any, should be for the people on duty that night. Ms. Hartzog, George Parham (the Assistant Jail Administrator, Arlene Griglen (a Shift Supervisor), and Evelyn Person (a Shift Supervisor), all met and reviewed the conduct of the individuals involved. A unanimous decision was made by the committee. At no time did the committee discuss the prior sexual harassment complaint made by Ms. Hunter eight months' earlier. The decision to punish Ms. Hunter more harshly than the two male jailers was because of the differences in experience and training of the individuals involved. Ms. Hunter was the highest-ranking officer on duty with the most on-the-job experience, and was the only one who had been to Jail Management School. She had over three years' experience, while Mr. Curry had approximately six months' experience, and Mr. Parker had less than five months' experience. Neither Mr. Curry nor Mr. Parker had attended Jail Management School. As a result, they received lesser punishment. Sheriff Williams accepted the recommendations of the Committee.

Sheriff Marshall J. Williams, Jr., denies all of the Plaintiff's allegations and

18

submits that he engages in nondiscriminatory employment practices.  George Parham denies that he engaged in any harassment, and further denies any inappropriate or unwanted conduct toward Ms. Hunter.  Jean Hartzog denies all of the Plaintiff's allegations, and submits that she engages in nondiscriminatory employment practices. Neither Barbour County nor the Barbour County Commission have any authority over Sheriff Williams' employment practices, and were not involved in any of the decisions in this case.  As a result, there is no basis for liability against them.

Defendants contend that Plaintiff has not suffered any damages and is not, therefore, entitled to a verdict in her favor for damages or injunctive relief.

Defendants adopt and incorporate all defenses raised in their Answer, as Amended herein, as if set forth more fully herein.

5.   <u>STIPULATIONS BY AND BETWEEN THE PARTIES</u>:

It is ORDERED that:

(1)   The jury selection and trial of this cause, which is to last five (5) days, are set for August 8, 2005, at 10:00 a.m., in Courtroom 2E, Frank M. Johnson, Jr.   Courthouse Complex, One Church Street, Montgomery, Alabama;

(2)   The parties are to file their pre-trial briefs, proposed jury selection questions, and proposed jury instructions by August 3, 2005;

(3)   Each party shall have available at the time of trial, for use by the court (the judge, the

19

courtroom deputy clerk, and the law clerk), three copies of the list of his or her exhibits;

(4) At least three days before trial, counsel are to contact the courtroom deputy clerk about the procedures for pre-marking all trial exhibits;

(5) Each party shall have available a sufficient number of copies of each photostatically reproducible exhibit for each of the jurors, opposing counsel, the courtroom deputy clerk, the law clerk, and the judge; and

(6) All understandings, agreements, and stipulations contained in this pretrial order shall be binding on all parties unless an objection is noted and filed with the court within seven (7) days from the date of this order.

DONE, this the 1st day of August, 2005.


   /s/ Myron H. Thompson   
UNITED STATES DISTRICT JUDGE